**Rachid NEJNAOUI a/k/a Nejnaoui Rachid, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 14–97–01188–CR.**

Court of Appeals of Texas, Houston (14th Dist.).

March 1, 2001.

Rehearing Overruled May 3, 2001.

---

112

Charles Freeman, Houston, for appellants.

Luther Alexander Dulevitz, Houston, for appellees

Panel consists of Justices SEARS, DRAUGHN, and AMIDEI.*

**OPINION**

AMIDEI, Justice (Assigned).

Rachid Nejnaoui, a/k/a Nejnaoui Rachid, appeals his jury conviction for aggravated

* Senior Justices Ross A. Sears and Joe L. Draughn, and Former Justice Maurice Amidei sitting by assignment.

assault. The jury assessed his punishment at twelve years' imprisonment. In eleven issues, or points of error, appellant contends: (1) he has been deprived of an adequate record (issues one, two, three, and four); (2) the trial court erred by overruling his objections to the "grant" court's jurisdiction and to the trial judge (issues five and six); (3) the trial court erred by overruling appellant's objections to his post-custodial oral statement (issue seven); (4) the trial court erred by excluding defense exhibit one (1) (issue eight); (5) the trial court erred by excluding testimony by Dr. Nurlin Shah (issue nine); and (6) there were jury charge errors (issues ten and eleven). We affirm.

## FACTS

Appellant had been estranged from his wife, Fatiha Fellat, since his release from an involuntary commitment in January 1995. The Harris County Psychiatric Center diagnosed him with major depression without psychotic features. On August 23, 1995, appellant purchased a gun and ammunition and went to his wife's apartment. He waited on the patio for her to return from work. Ms. Fellat returned around 11:00 p.m., and appellant jumped out from behind a barbecue grill scaring her. She screamed and ran to the parking lot. Appellant caught up with her and grabbed her arm. She struggled to get loose, screamed, then heard a gunshot and saw a muzzle flash by her face. She broke away and appellant fired four or five more shots at her, wounding her severely. One bullet passed through her chest, one grazed her forehead, one grazed her wrist, and one hit her in the back. The next day, appellant took a taxi to the shop of a former business partner. Appellant had the gun in his hand, but did not point it at the man. The police were called to investigate a suspicious man with a gun and gunshots. Officer John Upton and Officer Retz drove to the scene, and Officer Upton observed appellant standing with the gun in his hand. The officers started to approach appellant, and he dropped the gun. Officer Upton asked appellant, "[W]hat are you doing with a gun out here?" Appellant responded, "[T]hat's the gun I shot my wife with last night." A subsequent ballistic analysis proved the gun was the same one used to shoot Ms. Fellat.

## Missing Jury Communication

In his first issue, appellant contends the clerk's record is inadequate because it does not contain a written communication to the trial court from the jury during punishment deliberations. In his second issue, appellant contends that the missing jury note severely limits his direct appellate review and renders this direct appeal "a meaningless ritual." The record contains the affidavit of Donna Valis stating the written communication from the jury to the trial court during deliberations was not part of the case file.

Appellant cites no authority, and this court is aware of none, requiring reversal where jury notes have been lost or destroyed, absent a showing of harm. The record shows the trial court told the jury panel: "I have written you an answer to the first. The law does not allow me to answer these questions." One of the jurors asked the court: "[W]hy is it you can't tell us the first one." After telling the juror that he did not hear him, the juror asked him again: "[W]hy can't you tell us the answer to the first to [sic]." The trial court told the juror: "[T]he law does doesn't [sic] allow me to."

The note is lost, and the nature of the jury's question is unknown. It appears that the trial court orally told the juror he could not answer the "first" question under the law. Appellant admits he cannot

demonstrate harm. Absent a showing of harm, we are unwilling to say the missing note requires reversal of appellant's conviction. TEX.R.APP.P. 44.2(b); *see McGowan v. State,* 664 S.W.2d 355, 358–59 (Tex. Crim.App.1984); *Glover v. State,* 956 S.W.2d 146, 149 (Tex.App.—Beaumont 1997, pet. ref'd).

In issue two, appellant asserts the missing jury note severely limits his appeal and he cites *Ward v. State,* 740 S.W.2d 794, 800 (Tex.Crim.App.1987) as authority for this proposition. *Ward* concerned the indigent appellant's right to a complete statement of facts, now called the "reporter's record." The jury note would have been part of the clerk's record in this case, formerly called the "transcript." *Ward* is not applicable to this case.

Appellant has cited no authority in support of his position, therefore, we find the point has been inadequately briefed and refuse to address it. TEX.R.APP.P. 38.1(h); *see Smith v. State,* 907 S.W.2d 522, 532 (Tex.Crim.App.1995). We overrule appellant's contention in issue two.

### Missing Exhibits

In issue three, appellant contends the reporter's record is inadequate because it does not contain defense exhibits two, three, four, five, six, seven, and eight, a collection of excerpts from psychology texts pertaining to consciousness. In issue four he contends the missing exhibits severely limit his direct appeal and renders it "a meaningless ritual."

The missing exhibits were supplemented to the clerk's record and filed in this court on June 16, 2000, as Supplemental Clerk's Record, Volume I of I. Because we now have the supplemental record, appellant's contentions in issues three and four are moot. *See Bell v. State,* 938 S.W.2d 35, 47 (Tex.Crim.App.1996); *Johnson v. State,* 987 S.W.2d 79, 83 (Tex.App.—Houston [14th Dist.] 1998, pet. ref'd); *Caldwell v. State,* 875 S.W.2d 7, 8 (Tex.App.—Houston [1st Dist.] 1994, pet. ref'd), *cert. denied,* 519 U.S. 859, 117 S.Ct. 160, 136 L.Ed.2d 104 (1996). Appellant's contentions in issues three and four are overruled.

### Challenge to the "Grant" Court

In issue five, appellant contends the trial court erred by overruling his objection to the "so-called 'grant' court and its jurisdiction." Appellant challenges the jurisdiction of the grant court under the federal Voting Rights Act. *See* 42 U.S.C.A. § 1973 (West 1994). He argues that the grant court constitutes an "unauthorized legal fiction," a "phantom court designed and managed by non-African-American district judges" unlawfully to dilute the voting strength of African Americans in Harris County, Texas.

Appellant does not: (1) contend that the trial court was created or its judge appointed in violation of applicable State statutes and rules; (2) challenge the validity or constitutionality of the underlying provisions allowing courts to be created or judges appointed in such manner; (3) specify the portion(s) of the Voting Rights Act that he contends were violated by the complained of actions; or (4) cite authority that any such violation of the Voting Rights Act: (a) deprives the trial court of jurisdiction; or (b) affords him standing to challenge the authority of the trial judge.

■ In *Randall v. State,* 875 S.W.2d 43, 44 (Tex.App.—Fort Worth 1994, no pet), the court of appeals stated:

Standing under the Voting Rights Act is limited to a private litigant attempting to protect his right to vote and seeking judicial enforcement of the prohibition against the infringement on that right due to his race. *See Roberts v. Wamser,* 883 F.2d 617, 621 (8th Cir.1989). More-

over, the remedy appellants seek is not provided by the Voting Rights Act. *See id.* The remedies available under the act focus on the enforcement of the right to vote. *See id.*

*Randall,* 875 S.W.2d at 44.

Appellant's contention provides no basis upon which it can be sustained and issue five is overruled.

## Challenge to Judge Hughes' Authority

In issue six, appellant contends the visiting judge assigned to his case, Judge Jon N. Hughes, was not authorized to preside over this case for the same reasons he lists under issue five. The record contains the order of the Second Administrative Judicial Region assigning Judge Hughes to the 262nd District Court of Harris County, Texas, for a period of four weeks beginning the 6th day of October 1997. Appellant's case commenced October 8, 1997, and concluded during the four weeks' period of Judge Hughes' assignment. The order is signed by the presiding judge of the Second Administrative Judicial Region and appears valid in all respects. *See Sparkman v. State,* 997 S.W.2d 660, 663 (Tex.App.—Texarkana 1999, no pet. h.).

■ Appellant asks us to determine his argument from his argument under issue five. It is incumbent upon counsel to cite specific legal authority and to provide legal argument based upon that authority. TEX.R.APP.P. 38.1(h); *Rhoades v. State,* 934 S.W.2d 113, 119 (Tex.Crim.App.1996). This is especially important where, as in the case at bar, the relevant area of law is not well defined. *Id.* Without appellant directing us to specific argument providing proper legal authority, we have nothing to review. We overrule appellant's contentions in issue six.

## Appellant's Oral Statement to Police

■ Officer Upton was dispatched to the scene to investigate a man carrying a gun and gunshots. When he arrived, he observed appellant standing with a gun in his hand. As Officer Upton approached, appellant dropped the gun. Officer Upton asked appellant: "[W]hat are you doing with a gun out here?" Appellant responded, "[T]hat's the gun I shot my wife with last night." Appellant asserts that he was in custody and that his statement was not an assertion of fact later found to be true and "which conduce to establish the guilty of the accused." TEX.CODE CRIM.PROC.ANN. art. 38.22, Sec. 3(c) (Vernon 1979 & Supp. 2000).

■ Even if the interrogations had been custodial, the restrictions on custodial, unrecorded oral statements do not apply to statements that contain assertions of facts or circumstances that investigators find to be true and that tend to establish an accused's guilt, such as facts that lead to the recovery of stolen property or the instrument with which an accused says the crime was committed. *Port v. State,* 791 S.W.2d 103, 107–08 (Tex.Crim.App.1990). As was the case in *Port,* appellant's statement was not found to be true until the ballistics test was run on the gun. *Id.* We find that the oral statement of appellant was admissible under article 38.22, Sec.3(c), Texas Code of Criminal Procedure. We overrule appellant's contentions in issue seven.

## Exclusion of Medical Records and Testimony of Psychiatrist

In issue eight, appellant contends the trial court erred in refusing to admit into evidence his medical records from the Harris County Psychiatric Center where he was treated for depression. The medical records are part of the appellate reporter's record, and were admitted as part of his bill of exceptions. In issue nine, he

contends the trial court erred in not allowing his psychiatrist, Dr. Nurlin Shah, to testify as to the meaning of the words "aware" and "conscious." He contends that such testimony would aid the jury in determining whether he acted "intentionally" and "knowingly" when he shot his wife.

The trial court confirmed that Dr. Shah last examined appellant in January 1995. The trial court then asked her if she was aware of what his mental condition was in August 1995, when appellant shot his wife. She advised the trial court that she did not know appellant's mental condition in August 1995, and she asked to be excused. The trial court excused Dr. Shah and refused to admit the records showing appellant's treatment in January 1995. The trial court also refused to admit exhibits two through eight which were a collection of excerpts from psychology texts pertaining to consciousness.

Appellant argues that Dr. Shah's testimony about "consciousness" would have assisted the jury in that his defense was that he was unaware of the consequences of his actions. As we understand appellant's argument, he is contending that Dr. Shah's testimony and the exhibits would assist the jury in determining whether he intentionally and knowingly committed the crime.

■ To be admissible, expert testimony must "assist" the trier of fact. TEX. R.EVID. 702. *Duckett v. State,* 797 S.W.2d 906, 914 (Tex.Crim.App.1990). Expert testimony assists the trier of fact when the jury is not qualified to "the best possible degree" to determine intelligently the particular issue without the help of the testimony. *Duckett,* 797 S.W.2d at 914. But, the expert testimony must aid—not supplant—the jury's decision. *Id.* The trial court's decision may not be disturbed on appeal absent an abuse of discretion. *Joiner v. State,* 825 S.W.2d 701, 708 (Tex.

Crim.App.1992), *cert. denied,* 509 U.S. 925, 113 S.Ct. 3044, 125 L.Ed.2d 729 (1993).

■ A similar contention was raised in *Thomas v. State,* 886 S.W.2d 388, 391(Tex.App.—Houston[1st Dist.] 1994, pet. ref'd). In *Thomas,* appellant attempted to introduce the testimony of a clinical psychologist regarding his state of mind during the guilt-innocence phase at the time he shot his girlfriend, Larose. *Id.* at 390. At trial, appellant did not deny killing Larose; he testified, rather, that he did not remember shooting Larose. *Id.* Appellant's expert witness, Dr. Quijano, testified for appellant's bill of exceptions that he met with appellant for six hours after the shooting incident. *Id.* He stated that appellant's mental and emotional state at the time of the shootings was more accurately described by the "diagnostic impression called adjustment disorder with mixed emotional features." *Id.* The disorder included emotional states such as anxiety, depression, and a sense of helplessness. As a result of the disorder, appellant's "emotion was overwhelming enough to reduce the degree of reasoning or rationality" at the time of the shootings. *Id.* Dr. Quijano further testified that such an affliction would affect appellant's ability to intentionally and knowingly carry out an act. The trial court refused to admit Dr. Quijano's testimony. The court of appeals held:

In the case before us, appellant contends that Dr. Quijano's testimony is relevant to the issue whether he intentionally and knowingly killed Larose. What he appears to be arguing is some sort of insanity defense, even though his expert testified that he was sane at the time of the shooting.... We do not believe, however, that absent a plea of insanity or evidence raising that defense, a proper way to negate intent is to show that a defendant does not have

the concurrent mental capability to know that his conduct was wrong. *See* Tex.Pen.Code Ann. § 8.01(a) (Vernon 1994).

The negation of intent is absence of intent; that is an entirely different concept than the incapacity to form an intent due to severe mental disease or defect. The latter we label "insanity." Appellant has attempted to fashion a hybrid defense to criminal responsibility, one in which he is admittedly sane but unable to form an intent to commit a proscribed act. We do not recognize any such defense as a legal justification for criminal acts. Because there is no such defense upon which appellant can rely, his expert's testimony was not relevant to any issue before the jury. Therefore, the trial court did not err in refusing it.

*Thomas,* 886 S.W.2d at 391.

We find that Dr. Shah's testimony would not be relevant to any issue before the jury because we "do not recognize any such defense as a legal justification for criminal acts." *Id.*

 Furthermore, Dr. Shah stated that she had no knowledge of appellant's mental condition at the time he shot his wife. For this reason alone, the trial court did not err in refusing her testimony and her exhibits because Dr. Shah had no personal knowledge of appellant's medical condition at the time of the shooting. A duly qualified expert witness may give his opinion based upon sufficient relevant facts, but those facts must be either within his personal knowledge, or assumed from common or judicial knowledge, or established by evidence. *See Holloway v. State,* 613 S.W.2d 497, 503 (Tex.Crim.App.1981). Because she had no personal knowledge of appellant's mental condition on the date of this offense, Dr. Shah's testimony would not be admissible. We hold that the trial

court did not abuse its discretion in refusing to allow Dr. Shah's testimony and in excluding the "learned treatises" from evidence. We overrule appellant's contentions in issues eight and nine.

### The Lesser Included Offense of Aggravated Assault

In issue ten, appellant contends the trial court erred in overruling his objection to the trial court's jury charge because it erroneously charged the jury on the lesser included offense of aggravated assault. Appellant argues that the indictment charges only attempted murder, and the lesser-included offense charge authorizes the jury to convict appellant of aggravated assault if they find he knowingly caused bodily injury to Ms. Fellat. As we understand appellant's argument, he contends that causing "bodily injury" was not alleged in the indictment, and therefore, the charge on the lesser offense was erroneous. Appellant admits that aggravated assault can be a lesser-included offense of attempted murder.

 The determination of whether an offense is a lesser-included offense of the offense charged is made without regard to punishment; one offense may be a lesser-included offense of another even if it carries the same penalty. *Mello v. State,* 806 S.W.2d 875, 878 (Tex.App.—Eastland 1991, pet. ref'd). The included offense need not be "lower" in the sense that it provides a lesser punishment. *Id.* The word "lesser" does not refer to the punishment range but to the factor that distinguishes the included offense from the offense charged, *i.e.,* less than all facts, less serious injury or risk of harm, less culpable mental state, or an attempt. *Johnson v. State,* 828 S.W.2d 511, 515–516 (Tex. App.—Waco 1992, pet. ref'd).

"Bodily injury" is defined as "physical pain, illness, or any impairment of physical condition." TEX.PENAL CODE ANN. § 1.07(a)(8) (Vernon 1994 & Supp.2000). Appellant does not argue that he did not commit aggravated assault by intentionally causing the victim bodily injury, and understandably so, for death necessarily includes bodily injury. *Cumbie v. State*, 578 S.W.2d 732, 735 (Tex.Crim.App.1979), *overruled on another ground, Almanza v. State*, 686 S.W.2d 157, 174 (Tex.Crim.App. 1984).

██ Because "bodily injury" is a "less serious injury or risk of harm" than death, we conclude that aggravated assault charging "bodily injury" is a proper lesser offense charge of attempted murder by causing death as alleged in the indictment. We hold there was no error in the trial court's charge. *Johnson*, 828 S.W.2d at 515–516.

██ Furthermore, since the lesser offense is deemed beneficial, an accused cannot complain on appeal that he was tried or convicted for the lesser offense rather than the greater. *Ex parte Green*, 548 S.W.2d 914, 917 (Tex.Crim.App.1977); *Mello*, 806 S.W.2d at 877. We overrule appellant's contentions in issue ten.

### Failure to Define "Conduct" in Jury Charge

In issue eleven, appellant contends the trial court's failure to define "conduct" in its jury charge was error. "Conduct" is statutorily defined as "an act or omission and its accompanying mental state." TEX. PEN.CODE ANN. § 1.07(a)(10) (Vernon 1994 & Supp.2000). " 'Act' means a bodily movement, whether voluntary or involuntary, and includes speech." TEX.PEN.CODE ANN. § 1.07(a)(1) (Vernon 1994 & Supp. 2000). " 'Omission' means failure to act." TEX.PEN.CODE ANN. § 1.07(a)(34) (Vernon 1994 & Supp.2000).

Appellant cites *Smith v. State*, 959 S.W.2d 1, 25–26 (Tex.App.—Waco 1997, pet. ref'd) as authority for his proposition that failure to define "conduct" was error. We note that the court of appeals found that this failure to define "conduct" was harmless error. *Id.* at 26. The *Smith* case involved only one charge of soliciting benefits from a prospective public contractor. In *Smith*, the term "conduct" only appeared in the definitions of "intentionally" and "knowingly." *Id.* In the application paragraph, the charge specifically instructed the jury that it must find that Smith intentionally or knowingly solicited the benefits alleged before it could find him guilty. *Id.*

██ In reviewing a jury charge for alleged error, an appellate court must examine the charge as a whole and not as a series of isolated and unrelated statements. *Dinkins v. State*, 894 S.W.2d 330, 339 (Tex.Crim.App.1995), *cert. denied*, 516 U.S. 832, 116 S.Ct. 106, 133 L.Ed.2d 59 (1995). A trial court has broad discretion in submitting proper definitions and explanatory phrases to the jury. *Macias v. State*, 959 S.W.2d 332, 336–337 (Tex. App.—Houston [14th Dist.] 1997, pet. ref'd). Proper instructions are those which help the jury in answering the questions and which find support in the evidence and inferences to be drawn from the evidence. *Id.* Nevertheless, the trial court must define any legal phrase that a jury must necessarily use in properly resolving the issues, and provide the statutory definition if available. *Nguyen v. State*, 811 S.W.2d 165, 167 (Tex.App.—Houston [1st Dist.] 1991, pet ref'd) (the court assumed error in the failure to define a term without deciding whether it was error in fact). *See also Arline v. State*, 721 S.W.2d 348, 352 n. 4 (Tex.Crim.App.1986) (stating "a statutorily defined word or phrase must be

included in the charge as part of the 'law applicable to the case' "). Assuming, without deciding, that the trial court's refusal to give the jury the statutory definition of "conduct" was error, we ask if the error created harm so as to require a reversal. TEX.R.APP.P. 44.2(b); *Nguyen*, 811 S.W.2d at 167.

Although statutorily defined, the court of criminal appeals held that the omission of the phrase "in the course of committing theft" from the jury charge was not reversible error. *Olveda v. State*, 650 S.W.2d 408, 409 (Tex.Crim.App.1983). The court reasoned as follows:

> [W]hen the statutory definition is not included in the charge, it is assumed the jury would consider the commonly understood meaning in its deliberations. Although error would result where the common meaning is more expansive than the statutory definition, such is not the case with the phrase "in the course of committing theft." Any possible misunderstanding of the phrase would have been more restrictive than the statutory definition, and could only have been to appellant's benefit.

*Id.*

We hold the same reasoning applies to the statutory definition of "conduct." The statutory definition of conduct is "neither complex nor unusual, and the definition is much like the common meaning of the word." *Smith*, 959 S.W.2d at 25; *Nguyen*, 811 S.W.2d at 167. The noun "conduct" is defined as: ". . . . 2: the act, manner, or process of carrying on . . . . 3: a mode or standard of personal behavior esp. as based on moral principles." WEBSTERS NEW COLLEGIATE DICTIONARY 235 (1977 ed.). In the charge, the term appears in the definitions of "intentionally" and "knowingly." *See* sections 6.03(a) & (b), Texas Penal Code. The term also appears in the definition of "deadly conduct," the abstract

statement of the law of deadly conduct, and the application paragraph for the lesser offense of deadly conduct. *See* section 22.05, Texas Penal Code.

 The "failure to give an abstract instruction is reversible only when such an instruction is necessary to correct or complete understanding of concepts or terms in the application part of the charge." *Plata v. State*, 926 S.W.2d 300, 302 (Tex. Crim.App.1996), *overruled on other grounds by Malik v. State*, 953 S.W.2d 234 (1997).

Here, the trial court provided the statutory elements of attempted murder, aggravated assault, and deadly conduct in the abstract portions of the charge. In other abstract sections, the trial court defined attempt, bodily injury, and serious bodily injury, and the culpable mental states related to attempted murder, aggravated assault, and deadly conduct. The first application paragraph applied the facts of the case to the law of attempted murder. It specifically instructed the jury that they must find that appellant intentionally attempted to murder Ms. Fellat before it could find him guilty. Should the jury acquit appellant of attempted murder, the court instructed them they should next consider whether appellant was guilty of aggravated assault. The court then provided the statutory elements of assault and aggravated assault. The court then instructed the jury on the lesser offense of aggravated assault in its application paragraph. The application paragraph instructed the jury that they must find that appellant intentionally or knowingly caused bodily injury to Ms. Fellat before they could find him guilty. Should the jury acquit appellant of aggravated assault, they could next consider the lesser offense of deadly conduct. The statutory elements of deadly conduct were set out in the abstract definition of deadly conduct,

and the facts were properly applied to the elements of deadly conduct in the application paragraph. The application paragraph instructed the jury that they must find appellant knowingly discharged a firearm at Ms. Fellat before it could find him guilty.

Because the application paragraphs clearly direct the jury to the facts of the case, the absence of the statutory definition of "conduct" could not have confused jury. Even if the omission of the definition was error, the error was not so harmful as to deny appellant a fair and impartial trial. *See Arline*, 721 S.W.2d at 351; *Macias*, 959 S.W.2d at 336–337. *See also Smith*, 959 S.W.2d at 25–26. Therefore, the trial court did not abuse its discretion in omitting the statutory definition of "conduct" from the jury charge. We overrule appellant's contentions in issue eleven.

We affirm the judgment of the trial court.